JOHN SEAMAN, RESPONDENT, v. THE CITY OF PERTH AMBOY, APPELLANT.

Argued June 23, 1922—Decided November 20, 1922.

1. Under the long standing practice of the Supreme Court, a writ of *certiorari*, when duly allowed by the court or a justice thereof, may be signed with the clerk's name and sealed with a common seal by the attorney suing it out (acting *pro hac vice* as the agent of the clerk) and is then operative as though it had been signed and sealed in the clerk's office.

2. A landowner on the corner of a public street, having a house and store property there, properly held to sustain special damage by the appropriation of five hundred feet of the opposite sidewalk by a railroad track, so as to confer a status to attack by *certiorari* an ordinance purporting to authorize the construction and maintenance of such track.

3. Section 9 of the Railroad act of 1903 (*Comp. Stat. p.* 4223), *held*, not to authorize the laying of railroad tracks longitudinally in public streets. Authority to lay such tracks must be expressly given by statute, or if by implication, then the implication must be a necessary one.

On appeal from the Supreme Court, whose opinion is reported in 97 *N. J. L.* 76.

For the appellant, *Thomas Brown* and *Leo Goldberger.*

For the respondent, *Joseph E. Stricker.*

The opinion of the court was delivered by

PARKER, J. The Supreme Court on *certiorari* set aside an ordinance of the city of Perth Amboy purporting to authorize the Lehigh Valley Railroad Company to construct, maintain and operate a railroad track longitudinally in a southerly direction on High street, one of the public streets of said city, on land which would normally be the easterly sidewalk of High street, for a distance of between five hundred and six hundred feet, terminating at the corner of Washington street. The city has appealed to this court.

The first point made is one of practice, viz., that the Supreme Court should have dismissed the writ on motion therefor, on the ground, as assigned, that "the said writ was not signed or sealed by the clerk of the Supreme Court." The burden of the argument is that a writ of *certiorari,* or, to be precise, a paper drawn in form of such a writ, is ineffective, even though bearing the *allocatur* of a justice of the Supreme Court or of the court itself, unless and until signed and sealed in the clerk's office, with the official seal described in rule 1 of the Supreme Court.

This, we think, has never been required in the practice. An examination of the digests shows no reported decision on the subject, and this alone is persuasive evidence that the present point is not well taken, if it appear that in fact writs of *certiorari* have habitually in the past been signed by attorneys of the court in the name of the clerk, and sealed by them with an ordinary seal. This, as every practicing lawyer knows, has always been the common custom with writs of summons. *Whitaker* v. *Turnbull,* 18 *N. J. L.* (3 *Harr.*) 174; *Updike* v. *TenBroeck,* 32 *Id.* 107, 111. A writ of attachment was upheld under similar circumstances in

*Morrel* v. *Buckley,* 20 *Id..* 667, 668. So, also, by common practice, an execution against goods only at common law was customarily signed and sealed by the attorney for the clerk. If against lands, it must, by statute, be recorded before deliverey to the sheriff. *Comp. Stat., p.* 2243, § 2. Writs of error issuing out of the Supreme Court did not require sealing by the clerk or his assistant until 1909, when the rule, now appearing as rule 27 of that court, was promulgated.

In the case of the prerogative writ of *certiorari,* which has always been a writ of grace, awarded in the discretion of the court, it is worthy of note that in the statutes the emphasis has always been laid on the allowance of such a writ rather than on any technical matter of form in the paper iself. Thus, in *Allin. L.* 1776, *p.* 473, § 16, the Supreme Court justices are not in vacation to "allow" certain writs of *certiorari* unless sufficient reasons in writing, signed by an attorney and showing probable cause, are presented; and similar requirements, including a recognizance, as conditions precedent to "allowance," are to be found in the same volume, page 487, section 16, of an act for the speedy recovery of "debts from six pounds to ten pounds." Whether the "allowance" was then required to be in writing does not appear on a somewhat limited examination of the old books, but later on we find the act of 1799 (*Pat.* 350), bearing on *certiorari* to courts of quarter sessions and justices' courts, section 5 of which provides "that no writ of *certiorari* shall be granted to remove any * * * proceedings, *unless it be signed* by one of the justices of the Supreme Court; and for want thereof, such writ shall be absolutely void and of no effect." In 1874 the revisers placed this section in the general act relative to the action of *certiorari. Rev.* 1877, *p.* 98, § 2. The revised act of 1903 provides that "no writ of *certiorari* shall issue out of the Supreme Court unless it be allowed in open court by rule, or be allowed and signed by a justice at chambers." *Comp. Stat., p.* 403, § 2.

Touching the actual practice of the attorney, as agent of the clerk, signing his name and affixing a common seal to

the writ, the present justices of the Supreme Court are unanimous in their recollection that this was a recognized practice at the bar; and examination of old files in the clerk's office of the Supreme Court shows that the common seal was affixed by attorneys probably as often as the official seal was affixed by the clerk, and this by no loose practitioners, but by counsel of standing and distinction, whose names are household words in our jurisprudence. For example, we find writs in this form bearing attorney's endorsement by Asa Whitehead in 1850 (State *v.* Van Pelt); Stephen B. Ransom in 1853 (Voorhees *v.* Chaffers); Richard S. Field (afterwards a federal judge) in 1855 (Johnson *v.* Green); in the same year, by Mercer Beasley, afterwards Chief Justice (Scattergood *v.* Lord); Jehiel G. Shipman in 1856 (Hixson *v.* Schooley); Amzi Dodd (later Vice Chancellor and judge of this court) in 1857 (Mingus *v.* Groshong); Theodore Runyon, afterwards Chancellor, in 1858 (Hamlin *v.* Harrison), and William L. Dayton, some time justice of the Supreme Court, in 1859 (Pitcher *v.* Brown). So that the late John C. Besson spoke with the authority of established practice, when he said in the seventies that "writs of *certiorari* * * * may be sealed with a common seal by the attorney, but every *certiorari* must be signed by one of the justices of the Supreme Court, and for want of such signature is absolutely void." *Bess. L. Prec.* 225. The utility of the practice is illustrated by its application in landlord and tenant cases, where defendant's attorney frequently attended the trial before the justice of the peace with a writ of *certiorari* in his pocket bearing an *allocatur* in due form, but which could not possibly have traveled to Trenton and back again in time to stay a warrant of dispossession. Such practice seems to have been sanctioned as necessary to preserve the status pending a review. *Mairs* v. *Sparks,* 4 *N. J. L.* *369; *S. C.,* 5 *Id.* 513, especially foot of *pp.* 514, 517. We may conclude the discussion of this point, already too long, by saying that when the Supreme Court rules were revised in 1913, the late Leslie C. Pierson, deputy clerk, a man of long experience in the office with a thor-

ough knowledge of the practice, suggested a change therein by the adoption of a rule requiring writs of *certiorari* to be sealed in the clerk's office, a suggestion to which the court, after due consideration, deemed it best not to accede. The conclusion is, that a writ of *certiorari*, when duly allowed, in writing, may be signed with the clerk's name and sealed with a common seal, by the attorney suing it out (acting *pro hac vice* as agent of the clerk), and is then operative as though it had been signed and sealed in the clerk's office.

This brings us to the merits of the case and the second point argued, which is, that the posecutor had sustained no such special damage as would give him a status to prosecute the writ. The material facts are that prosecutor owns a store and dwelling-house property on the northwest corner of Washington and High streets, and the proposed track will occupy the easterly sidewalk for over five hundred feet and as far as the northeasterly corner of the same streets. The Supreme Court found in fact that he would sustain special damage, and in this we concur, and for reasons given in the opinion of that court.

Finally, it is urged that the court below erred in holding that the enactment of the ordinance was an unreasonable exercise of the powers vested in the municipality. We find it unnecessary to comment on this phase of the case for a reason which seems fundamental, viz., that in our view the municipality had no power at all to authorize the occupation of an existing public street, or part thereof, by a railroad track running longitudinally therein. This was expressly held by the Supreme Court in *Thompson v. Ocean City Railroad Co.*, 60 *N. J. L.* 74, and by this court in *Tallon* v. *Hoboken*, 60 *Id.* 212, 214. In 1896 an act was passed purporting to authorize certain cities to grant longitudinal rights to certain railroads (*Pamph. L.* 1896, *p.* 228), but this was held unconstitutional, and a proposed longitudinal track enjoined in *Burlington* v. *Pennsylvania Railroad Co.*, 56 *N. J. Eq.* 259; *affirmed*, 58 *Id.* 547. The rule was recognized in *Jersey City* v. *North Jersey Street Railway Co.*, 74 *N. J. L.* 774, 777 (1907). In the case at bar, it seems to have

been claimed in the court below that the city was authorized to grant such a privilege under section 9 of the revised Railroad act of 1903 (*Pamph. L., p.* 645; *Comp. Stat., pp.* 4219, 4223); but the rule of construction in this class of statutes is that the authority to make such a use of streets or highways must be expressly given, or, if conferred by implication, it must be by necessary implication. *Thompson* v. *Ocean City Railroad Co.,* 60 *N. J. L.* 74 (at *p.* 77), and authorities cited. We find no such authority, either express or implied, in the section cited. In fact, it does not mention streets or highways at all, but authorizes branch lines extending from the main line or an existing branch line to any mill, factory, &c. As was observed by Vice Chancellor Reed in the *Burlington Case,* 56 *N. J. Eq.* 259 (at *pp.* 261, 262) : "The company was empowered to lay its tracks between certain *termini,* which involved the necessary implication of a power to *cross* highways that lay between the terminal points, but it involved no necessity of running longitudinally along a road or street."

Paragraph 26 of section 37 of the revised charter of Perth Amboy is also invoked. *Pamph. L.* 1870, *p.* 1142. But this is merely the usual provision, and fully covered by the opinion in *Tallon* v. *Hoboken, supra.*

The action of the Supreme Court in setting aside the ordinance is therefore affirmed on the ground of total lack of authority in the city to consent to or permit the laying of the track in question.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, SWAYZE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, WILLIAMS, GARDNER, VAN BUSKIRK, JJ. 13.

*For reversal*—None.